IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTINE ALTER,                                          Civ. No. 1:12-cv-00737-AC

                Plaintiff,                                   FINDINGS AND
                                                                          RECOMMENDATION
      v.

COMMISSIONER of Social Security,

                Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

Claimant Christine L. Alter ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 401-434. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court concludes that the decision of the Commissioner should be reversed and remanded for an award of benefits.

*Procedural History*

Claimant filed for DIB benefits on September 3, 2008, alleging a disability onset date of August 1, 2006.  The claim was denied initially and upon reconsideration.  On August 5, 2010, a hearing was held before and Administrative Law Judge ("ALJ"), who issued a decision on August 27, 2010, finding Claimant not disabled.  Claimant requested a review of this decision on September 7, 2010.  The Appeals Council denied this request, making the ALJ's decision the Commissioner's final decision.  Claimant filed for review of the final decision in this court on April 25, 2012.

*Factual Background*

Claimant is a 53 year-old woman with a high school education, having obtained an equivalency diploma (GED).  In her disability report, dated September 29, 2008, Claimant reported that she was five feet and nine inches tall and weighed 190 pounds.  (Tr. 140.)  She stated that back pain, arthritis, nerve damage, a disc condition, hip and knee pain, neuropathy, neck and shoulder pain, fibromyalgia, blurred vision, memory problems, depression, anxiety, and incontinence limited her ability to work.  (Tr. 141.)  Claimant stated that she cannot sit or stand for more than a few minutes at a time and that she is in constant pain.  *Id.*  She stated her feet and hands feel like they are on fire or that she is walking on shards of glass.  *Id.*  Claimant reported trouble with her memory and carrying on conversations.  *Id.*  Claimant reported that she became unable to work due to her various conditions on November 11, 2006.  *Id.*  She reported being laid off from her previous employment on April 15, 2006.  *Id.*  She described her last position as a Treasury Operations Manager.  (Tr. 142.)  She reported working eight hours a day, five days a week, primarily sitting at a desk.  *Id.*  Claimant reported the job required the use of equipment, technical knowledge, and completing reports.  *Id.*

Claimant also completed a disability report on March 16, 2009. She reported increased pain in her back, legs, and hips. (Tr. 185.) She reported being miserable, hating her life, and feeling angry and depressed. *Id*. Claimant reported additional symptoms and was unsure whether they were related to the medication she was taking. (Tr. 190.) The record contains a "Vocational Decision Worksheet," completed by Doreen G. Utz ("Ms. Utz"), which reported Claimant was capable of performing her past relevant work as a Treasury Operations Manager. (Tr. 178.)

Claimant completed a function report on November 6, 2008. She reported that she could no longer work in her yard or on home improvement projects, exercise, or socialize. (Tr. 170.) Claimant stated that she no longer cooks meals for herself or her family because it is too painful to stand and she has fallen before. (Tr. 171.) She reported needing help with housework because she cannot clean for more than a few minutes at a time. *Id*. Claimant stated that she rarely drives because she does not want to be distracted by intense pain. (Tr. 172.) She stated that, as a result of her memory problems, she has paid bills late, bought things she did not need, and ruined her and her husband's credit. (Tr. 172-73.) Another agency report stated that there are some lingering credibility issues regarding inconsistencies between Claimant's allegations and the medical records. (Tr. 248.)

Claimant's friend, Carrie Chisolm ("Ms. Chisolm") filled out a third party function report on Claimant's behalf. Ms. Chisolm stated that she sees Claimant three to four times per week for several hours at a time, sometimes more often. (Tr. 153.) She reported that Claimant stays home and can take care of her basic needs. *Id*. Ms. Chisolm reported that Claimant moves from the couch to the bed trying to manage her pain and will socialize with her husband or if she has guests. *Id*. She stated that Claimant usually goes to bed early because of sleeping problems. *Id*.

Ms. Chisolm stated that Claimant might have trouble remembering to take her medicine because she sometimes falls behind on her prescriptions until her pain becomes unmanageable. (Tr. 155.) She reported that Claimant does very little cooking and housework because she cannot stand for long. *Id*. Ms. Chisolm reported these tasks are now primarily done by her husband and friends. *Id*. She stated that Claimant will occasionally go out alone to see the doctor, but it is difficult for her because she does not take her medicine when she drives. (Tr. 156.) She reported that Claimant has other people do her shopping. *Id*. Ms. Chisolm reported that Claimant has fallen behind on her finances because she cannot work and is forgetful. (Tr. 157.) Ms. Chisolm stated Claimant's only hobbies are reading, watching TV, and crosswords, but Claimant has reported difficulty with crosswords because of her memory problems. *Id*. She reported that Claimant has also been forgetting her doctor appointments and sometimes needs someone to accompany her to them. *Id*. Ms. Chisolm reported that Claimant is more irritable. (Tr. 158.)

In the section, "Information About Abilities," Ms. Chisolm checked off that Claimant's conditions affect: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 158.) Ms. Chisolm stated, "She is pretty much unable to do any movement above because it causes so much pain and her memory has been going downhill." *Id*. She reported that Claimant's concentration has gone down and she does not finish what she starts. *Id*. Ms. Chisolm stated that Claimant's inability to work and her financial situation causes her stress that she does not manage well. (Tr. 159.) She also reported that Claimant might have an unusual fear of leaving her house. *Id*.

Claimant's medical records reveal a history of back pain, malformations of the spine, and the onset of degenerative disc disease dating back to 2006. On August 18, 2006, Claimant had x-

rays taken at Rogue Valley Medical Center. (Tr. 312, 318.) She had a clinical history of pain. *Id*. X-rays of her bilateral hips showed transitional vertebrae at the lumbosacral junction, with partial sacralization, and a pseudoarthrosis on the left, but otherwise negative bilateral hips. (Tr. 312.) X-rays of her lumbar spine showed transitional vertebral at the lumbosacral junction with sacralization on the left, and minor multi level osteophytosis suggesting some minor degenerative disc disease. (Tr. 318.)

On June 21, 2007, an MRI of Claimant's lumbar spine showed: an ovarian cyst, the possibility of right radicular symptoms at L4-5, borderline mild multifactorial central canal stenosis at L2-3, mild lateral recess stenosis bilaterally with probable slight impingement of the traversing L-3 roots, borderline mild foraminal stenosis with no exiting root impingement at L3-4, and transitional type vertebra and an enlarged left transverse process forming a pseudoarthrosis with the left upper sacrum at L-5. (Tr. 466.) On July 26, 2007, the cyst was surgically removed. (Tr. 206.) Claimant's pre-operation physical examination states that she was taking Effexor and had a history of anxiety and depression. (Tr. 210.)

An x-ray report of Claimant's cervical spine on October 10, 2007, noted a history of neck pain and showed reversal of lordosis. (Tr. 323.) On October 25, 2007, Claimant visited a neurological surgeon, Dr. Donald A. Ross ("Dr. Ross"), with complaints of back, neck, arm, and leg pain. (Tr. 213.) Claimant reported to Dr. Ross that she hurt her back lifting pavers in June of 2006. *Id*. Claimant initially believed she injured her hip, but reported that her back pain never resolved after June 2006. *Id*. She tried physical therapy in the past, but reported becoming more reliant on her prescriptions because the physical therapy was only mildly helpful. *Id*. The report indicates Claimant smoked one pack of cigarettes per day. (Tr. 214.) Dr. Ross noted Claimant's range of motion in her lumbar spine was limited due to pain. (Tr. 215.) Dr. Ross found

Claimant had lumbosacral back pain, but was uncertain of the etiology of Claimant's pain and did not see anything surgically treatable. (Tr. 216.) He opined that Claimant could have a rheumatic condition and agreed she should have a rheumatologic evaluation. *Id.* Dr. Ross explained that tobacco contributes to back pain problems, and advised Claimant to quit smoking. *Id.*

On November 12, 2007, Claimant visited Dr. Kristine Groskopp ("Dr. Groskopp"), a doctor of osteopathy. (Tr. 279.) Claimant also reported to Dr. Groskopp that she hurt herself moving pavers. *Id.* Dr. Groskopp noted that Claimant smoked a half pack of cigarettes per day, but was trying to smoke less. *Id.* Claimant described joint pain all over, prickling in the top of her hands, and feeling like she was walking on nails. *Id.* Dr. Groskopp examined Claimant and found her to appear "anxious and in no acute distress." *Id.* She found that Claimant had a decreased range of motion in her back and felt pain when moving her neck. *Id.* Claimant was tender in multiple areas. *Id.* Dr. Groskopp found that Claimant had paresthesias of the legs and hands and might have a rheumatologic condition. *Id.* On November 28, 2007, Dr. Groskopp noted that, after taking Lyrica, Claimant had an episode of paralysis where she also felt "sound zooming from ear to ear" and like someone "splashed paper in front of her." (Tr. 276.)

On November 30, 2007, Claimant was examined by Dr. Lawrence Levin ("Dr. Levin"), a rheumatologist. (Tr. 221.) Claimant reported to Dr. Levin that she injured herself in the spring of 2006 while moving pavers and has had chronic low back pain since that time. *Id.* Claimant reported the same symptoms previously reported to Drs. Ross and Groskopp. *Id.* Dr. Levin noted Claimant was having trouble sleeping, and steroid injections had not relieved her back pain. *Id.* He opined that Claimant's history and MRI seem consistent with mechanical back pain problems and possibly radiculopathy. (Tr. 222.) He noted Claimant showed features of

fibromyalgia, and suspected they were associated with Claimant's chronic back pain, right lower extremity pain, and poor sleep. (Tr. 223.) An x-ray of Claimant's lumbar spine showed: a transitional L5 vertebra on the left side, mild degenerative disc disease of L3-4, and mild to moderate degenerative changes in the facets at L3-4 and 4-5. (Tr. 224.)

Claimant followed up with Dr. Levin on December 6, 2007. (Tr. 219.) Dr. Levin noted Claimant's multilevel disc disease, disc protrusions, and pseudoarthrosis reported by the MRI on June 21, 2007. *Id*. Dr. Levin reported that Claimant's pain started at L2-4 levels and radiated to her right lower back and right buttock. *Id*. He also reported that Claimant was functionally not able to work because of her pain. *Id*. Dr. Levin suspected Claimant's back pain was mechanical, but recommended an MRI due to its severity. (Tr. 220.) He again noted features of fibromyalgia, which he suspected were being driven by her spinal problems. *Id*.

A December 17, 2007, MRI of Claimant's sacroiliac ("SI") joints showed mild degenerative changes in both SI joints. (Tr. 232.) A December 28, 2007, MRI of Claimant's thoracic spine showed: a single atypical hemangioma abutting the superior endplate of T5, mild to moderate focal degenerative changes, milder degenerative changes of the midthoracic spine with disc space narrowing and disc desiccation, focal degenerative changes of the midcervical spine, and mild reversal of the normal cervical lordosis. (Tr. 230-31.)

Dr. Levin referred Claimant to a pain specialist and, on January 29, 2008, Claimant was examined by Dr. George D. Johnston ("Dr. Johnston"). (Tr. 365.) Claimant again reported that she hurt herself while moving pavers in 2006, and she reported her pain had steadily progressed since the injury. *Id*. Dr. Johnston noted that Dr. Levin diagnosed Claimant with fibromyalgia, and Dr. Ross did not think surgery was appropriate. *Id*. Claimant had tenderness in 13 of the 18 fibromyalgia points. (Tr. 366.) Dr. Johnston assessed that Claimant had SI joint dysfunction,

lumbar radiculopathy, and myofascial pain syndrome.  *Id*.  He recommended beginning treatment with SI joint injections, instead of the lumbar epidural steroid injection for which Claimant was referred.  *Id*.  Claimant received bilateral SI joint injections on February 22, 2008.  (Tr. 363.)  Claimant noticed significant reduction in her low back pain immediately following the injections, but the next day her pain returned to baseline.  (Tr. 361.)  Claimant reported to physician's assistant Anne Ryland ("PA Ryland") that she had fifty-percent pain relief for about two and a half weeks after the SI joint injections.  (Tr. 269.)

On April 14, 2008, Dr. Johnston examined Claimant again and assessed that lumbar radiculopathy was her primary ailment.  *Id*.  He then gave Claimant bilateral L4/5 transforaminal epidural injections.  (Tr. 362.)  Claimant's pain improved for a short period of time following that procedure, but eventually returned and increased significantly.  (Tr. 359.)  Claimant was taking Norco and Neurontin for her pain, but felt they only slightly helped her pain.  *Id*.  She did not report adverse side effects from either medication.  *Id*.  Claimant received a right L4/5 transforaminal epidural injection on June 20, 2008.  (Tr. 355.)  On July 7, 2008, she reported that her significantly increased low back pain had returned to baseline.  (Tr. 357.)  She also reported some relief in her low back pain as a result of using a TENS unit.[1]  *Id*.  On September 23, 2008, Dr. Johnston reported that, per his suggestion, Claimant saw Dr. Glen O'Sullivan ("Dr. O'Sullivan"), an orthopedist, and Dr. Zakir Ali ("Dr. Ali"), a neurologist.  (Tr. 353.)  At this time, Dr. Johnston added lumbar degenerative disc disease to his assessment of Claimant's conditions, and started Claimant on Fentanyl patches to treat her pain.  (Tr. 354.)

---

[1] TENS is "[a] technique used to relieve pain in an injured or diseased part of the body in which electrodes applied to the skin deliver intermittent stimulation to surface nerves, blocking the transmission of pain signals." The American Heritage Dictionary 1794 (5th ed.2011).

On August 19, 2008, Dr. Ali performed nerve conduction and EMG studies on Claimant. (Tr. 236.)  He found evidence of a mild, chronic right L5 radiculopathy.  *Id*.  Claimant's distribution of numbness and pain and the EMG findings were all suggestive of right L5 nerve root involvement.  *Id*.  Dr. Ali opined the nerve root involvement to be chronic and mild.  (Tr. 237.)  He found Claimant was developing early distal axonal polyneuropathy and had paresthesias and allodynia in her feet.  *Id*.

Dr. O'Sullivan examined Claimant on September 12, 2008.  (Tr. 238.)  He noted Claimant had urinary incontinence, as well as her pain symptoms.  *Id*.  He found Claimant had restricted range of motion of the cervical spine with pain on end range of motion.  *Id*.  Dr. O'Sullivan examined Claimant's lumbar spine and found loss of lumbar lordosis, mild local tenderness, and restricted range of motion.  *Id*.  Claimant's range of motion in her right hip was slightly restricted compared to the left hip.  (Tr. 239.)  Dr. O'Sullivan's assessment of Claimant revealed a herniated disc L4-5, left side transitional L5-S1 segment with large transverse pseudoarthrosis, mechanical neck pain, right trochanteric bursitis, urinary incontinence, and depression.  *Id*.  On September 19, 2008, PA Ryland noted that Claimant was in severe pain to the point that she needed her daughter to tie her shoes for her.  (Tr. 262.)  PA Ryland also noted that Claimant was very depressed and increased her Effexor dosage.  *Id*.

Between September 23, 2008, and November, 4 2008, Claimant's Fentanyl dosage was doubled because the initial dosage was not providing her any pain relief.  (Tr. 351.)  Claimant also overused her Norco, and as a result was not taking it the two weeks prior to November 4, 2008.  *Id*.  PA Ryland had noted in June 2008 that Claimant had taken extra Norco and had poor control of her pain.  (Tr. 264.)  Claimant was warned about her medication overuse.  (Tr. 352.)  Claimant requested to defer any interventional procedures, including steroid injections.  *Id*.

On November 7, 2008, a CT scan revealed Claimant had small anterior herniations at L3-4 and L4-5.  (Tr. 368.)  Also on November 7, 2008, Dr. Johnston assessed that degenerative disc disease was Claimant's primary ailment.  (Tr. 349.)  Dr. Johnston performed lumbar provocative discography on Claimant's L3-4, L4-5, and L5-S1.  *Id*.  This revealed concordant right buttock pain at L5-S1, discordant pain at L3-4 and L4-5, and annular tears at all three levels.  (Tr. 350.)

On November 12, 2008, PA Ryland noted that the increased dosage of Effexor had slightly improved Claimant's depression, but Claimant was embarrassed to seek counseling because she thought she should be able to handle her pain.  (Tr. 258.)  PA Ryland referred Claimant to Dr. Thompson to treat her severe depression, but Claimant never heard back from Dr. Thompson's office.  (Tr. 257.)  On December 31, 2008, Claimant reported to Dr. Johnston that her pain was not well controlled and she felt more depressed because of her pain.  (Tr. 345.)  Dr. Johnston increased Claimant's fentanyl dosage.  (Tr. 346.)  PA Ryland continued to treat Claimant for depression, urinary incontinence, and back pain throughout 2009.  (Tr. 407-18.)

Claimant followed up with Dr. O'Sullivan on January 23, 2009.  (Tr. 392.)  He noted Claimant's legs had been giving out, causing her to fall.  *Id*.  An MRI confirmed disc bulges in the lumbar spine at L4-5 and the transition level L5-S1.  *Id*.  Dr. O'Sullivan was not confident that surgery was a viable option because correcting one part of Claimant's spine could further compromise others.  *Id*.  Dr. O'Sullivan referred Claimant to Dr. Ivan Cheng ("Dr. Cheng") at Stanford University.  (Tr. 392, 395.)

On June 9, 2009, Claimant was examined by Dr. Cheng at Stanford.  (Tr. 395.)  Dr. Cheng could not determine an obvious structural reason for Claimant's pain and opined that there was not a surgical solution.  (Tr. 396-97.)  Dr. Cheng recommended that the best treatment

option for Claimant is rehabilitation with an emphasis on conditioning and strengthening core and spinal muscles.  (Tr. 397.)

Claimant continued managing her pain with Dr. Johnston throughout 2009.  On July 29, 2009, Dr. Johnston increased Claimant's dosage of pain medication, but advised her that this would likely not be an effective long-term plan to manage her pain because the medications will lose effectiveness.  (Tr. 381.)  Dr. Johnston discussed spinal cord stimulation, but Claimant was reluctant to get the implant.  *Id*.  Claimant agreed to see Dr. Brad S. Kauder ("Dr. Kauder"), a psychologist, to be evaluated for depression and the mental fitness to have a spinal cord stimulator implanted.  *Id*.

Dr. Kauder interviewed Claimant on February 11, 2010.  (Tr. 470.)  Claimant was apprehensive about having the spinal cord stimulator implanted.  (Tr. 472.)  Claimant reported frustration, memory loss, trouble with words and communicating, and other neurocognitive inefficiencies to Dr. Kauder.  *Id*.  Claimant opined these problems might be due to her medication.  *Id*.  Dr. Kauder did not complete a mental evaluation of Claimant, and Claimant never returned for further testing.  (Tr. 474.)

On February 19, 2010, Claimant saw Dr. Paul Schroeder ("Dr. Schroeder") regarding her worsening incontinence.   (Tr. 425.)   Dr. Schroeder found Claimant had severe urinary incontinence associated with urethral hypermobility and opined that a transobturator sling should be helpful. (Tr. 426.)  He recommended that Claimant avoid smoking and drinking caffeine.  *Id*. Dr. Schroeder surgically implanted a bladder sling in Claimant on June 3, 2010.  (Tr. 481.)

On June 9, 2010, Claimant was examined by another rheumatologist, Dr. David Dryland ("Dr. Dryland").  (Tr. 439-41.)  Claimant complained of worsening lower back pain and pain all over.  (Tr. 439.)  She reported that she was unable to work.  *Id*.  Claimant had positive responses

to all 18 fibromyalgia tender points. (Tr. 441.) Dr. Dryland opined that Claimant had chronic lower back pain and fibromyalgia. *Id.*

Claimant's physical and mental Residual Functional Capacities ("RFC") were assessed separately. The mental assessment, performed by Ms. Utz on January 1, 2009, noted that Claimant has no indication of depression or memory issues. (Tr. 240.) Utz notes that Claimant's feelings of depression and memory loss are secondary to her physical limitations, and not the result of a psychotic illness. *Id.* The physical assessment was completed by Dr. Richard Alley ("Dr. Alley"). (Tr. 248.) Dr. Alley opined that Claimant's allegations are not consistent with the objective medical findings. *Id.* He found Claimant to have the following limitations: occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; unlimited push or pull, other than her lift/carry limitations; and occasional climbing. (Tr. 242-243.) Dr. Alley found there was not a medical source statement regarding Claimant's physical capacities. (Tr. 247.)

*Summary of the ALJ's Findings*

The ALJ engaged in a five step "sequential evaluation" process when he evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since August 1, 2006, the alleged onset date. (Tr. 25.) At Step Two, the ALJ determined that Claimant had the following severe impairments: mild degenerative disc disease, mild lower extremity radiculopathy, fibromyalgia, and chronic pain syndrome. *Id.* The ALJ found no definitive diagnosis of depression or anxiety by an acceptable medical source. *Id.* The ALJ did

not make specific findings regarding each impairment, but instead discussed portions of Claimant's medical history when determining her RFC.

## II.    Step Three

At Step Three, the ALJ concluded that Claimant's impairments do not satisfy or medically equal the requirements set forth in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 26.)  The ALJ gave particular consideration to Listing 1.00 and noted, "[n]o treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment." *Id*.

## III.    Claimant's RFC

The ALJ considered the record and determined that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is capable of climbing no more than occasionally." *Id*.  To evaluate Claimant's subjective symptoms the ALJ is required to follow a two-step process. *Id*.  First, the ALJ must determine whether Claimant has an underlying medically determinable impairment or impairments that could reasonably be expected to produce Claimant's symptoms. *Id*.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." *Id*.  The ALJ noted that whenever statements about the limiting effects of a claimant's symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire record to determine the credibility of the statements. *Id*.

At step one, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms.  (Tr. 27.)  At step two, the ALJ considered Claimant's disability and function reports and found Claimant's statements

regarding the intensity, persistence, and limiting effects of her symptoms lack credibility to the extent they are inconsistent with Claimant's RFC. (Tr. 26-27.) The ALJ also considered the function report filled out by Ms. Chisolm and noted, "Ms. Chisolm generally supported the claimant's allegations." (Tr. 27.) The ALJ gave Ms. Chisolm's report "some weight" regarding Claimant's limitations on prolonged activities, but found Ms. Chisolm's credibility was lessened because she relied heavily on Claimant's subjective reporting. *Id*.

The ALJ characterized Claimant's impairments as mild and found that her medical records negatively impacted her credibility. (Tr. 29.) The ALJ notes "that there are no pertinent medical records in evidence until one year after the claimant's alleged onset date." (Tr. 27.) The ALJ cited Claimant's visit to Dr. Ross in October 2007 as the earliest pertinent medical record. *Id*. The ALJ noted that Dr. Ross was uncertain about the etiology of Claimant's back pain. *Id*. The ALJ next looked to Claimant's November 12, 2007 follow-up with Dr. Groskopp. (Tr. 28.) The ALJ states that Claimant "appeared to have requested this examination to obtain stronger pain medication than PA Ryland was able to prescribe." *Id*. The ALJ determined that Dr. Groskopp denied this "request" because Claimant's symptoms were too vague, but prescribed Lyrica instead. *Id*.

The ALJ noted that Dr. Levin found Claimant showed features of fibromyalgia, but believed they were secondary to Claimant's chronic back pain, right lower extremity pain, and poor sleep. *Id*. The ALJ found that Dr. Levin could not help Claimant and, following Dr. Levin's recommendation, Claimant established herself with a pain management clinic. *Id*. The ALJ noted that Dr. Johnston at the pain management clinic tried several treatments, but Claimant continued to complain of significant back pain and numbness in her hands and feet. *Id*. The ALJ found it significant that Claimant reported fifty-percent relief of pain after Dr. Johnston increased

her Fentanyl dosage in September 2009.  (Tr. 28-29.)  However, the ALJ also noted that Dr. Johnston informed Claimant this was not an effective long-term plan because the medicine would not remain effective.  (Tr. 28.)

The ALJ acknowledged that Claimant was prescribed multiple injections and medications for her pain, but stated "the claimant [was] resistant to any recommended alternative treatments." *Id*.  The ALJ explained that Dr. Johnston referred claimant to Dr. Kauder for a mental evaluation and a pre-implantation screening for a spinal cord stimulator, but claimant attended only one appointment with Dr. Kauder.  (Tr. 29.)  The ALJ also found that a neurosurgeon at Stanford University recommended a core strengthening program and that Claimant should quit smoking. (Tr. 28.)

Ultimately, the ALJ determined that the record provided full support for the RFC arrived at, and that Claimant and Ms. Chisolm's subjective statements are not credible to the extent they are inconsistent with the RFC.  (Tr. 29.)  The ALJ reasoned:

> According to the records she provided, the claimant did not seek treatment for a significant period of time after her alleged onset date.  She did not leave her job due to her medically determinable impairments.  Objective findings support classifying her conditions as mild, at most.  The claimant has opted not to pursue several treatment options recommended by a variety of specialists.  In the past year, she has reported 50 percent improvement of her symptoms and yet she has continued to request and/or accept increases in her prescribed dosages.

*Id*.

IV.    Step Four

At Step Four, the ALJ determined that Claimant "is capable of performing her past relevant work as an office manager and/or as an administrative assistant."  (Tr. 30.)  The ALJ based his determination on Claimant's RFC and the testimony of the vocational expert (VE) that

these jobs qualify as past relevant work.  *Id*.    Because the ALJ found that Claimant is not

disabled and can return to her past work, he did not proceed to Step Five.  *Id*.

*Discussion*

Claimant argues that the ALJ erred on five grounds: (1) the ALJ improperly rejected

Claimant's testimony; (2) the ALJ failed to consider medication side effects; (3) the ALJ failed

to fully and fairly develop the record; (4) the ALJ improperly rejected the lay witness statements;

and (5) the ALJ's vocational hypothesis was invalid.  The court will address each objection in

turn.

I.      Claimant's Testimony

Claimant argues that the ALJ erred when he found that Claimant's testimony was less

than fully credible because the ALJ's reasoning for rejecting Claimant's symptom testimony was

not clear and convincing.  Specifically, Claimant argues that the medical records are contrary to

the ALJ's assertions and that there is no evidence in the record that is contrary to Claimant's

assertion that she is only able to engage in sporadic activity.  Claimant further alleges that the

ALJ did not identify specific evidence that showed specific testimony is not credible.   The

Commissioner responds that the ALJ's based his credibility finding on clear and convincing

reasons supported by substantial evidence.

"Once a claimant produces objective medical evidence of an underlying impairment, an

[ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective

medical evidence to fully corroborate the alleged severity of pain."  *Rollins v. Massanari*, 261

F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991))

(internal quotation omitted).  If the ALJ finds the subjective complaints less than credible, the

ALJ must make specific findings that support that conclusion.  *Id*.  "[T]he findings 'must be

sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit [the] claimant's testimony. *Id.* at 856-857 (quoting *Bunnell*, 947 F.2d at 345). In the absence of evidence that the claimant is malingering, the ALJ must give "clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms." *Id.* at 857 (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaint." *Redick*, 157 F.3d at 722 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)) (internal quotation omitted). Finally, if the ALJ improperly rejects a claimant's subjective symptom testimony, and the claimant would be disabled if the testimony were credited, the testimony is credited as a matter of law. *Chater*, 81 F.3d at 834.

The ALJ found that acceptable medical sources diagnosed Claimant with mild degenerative disc disease, mild lower extremity radiculopathy, fibromyalgia, and chronic pain syndrome. (Tr. 25.) However, the ALJ found Claimant's subjective symptom testimony lacked credibility to the extent it was inconsistent with the RFC. (Tr. 27.) The ALJ gave the following reasons as to why Claimant's testimony lacked credibility: she did not seek treatment for a significant amount of time after her alleged onset date; she did not leave her job due to her impairments; objective findings support classifying her impairments as mild; she has opted not to pursue several treatment options; and she reported a fifty-percent improvement of her pain symptoms, but continues to increase her pain medication. (Tr. 29.)

Although the ALJ gave reasons for rejecting Claimant's testimony as not credible, the ALJ did not specify which evidence undermines which parts of Claimant's testimony, finding only that Claimant's testimony regarding her symptoms is not credible to the extent it is

inconsistent with the RFC.  (Tr. 27.)  Furthermore, the ALJ's findings and reasoning are not consistent with the evidence in the record.

The ALJ cited Claimant's October 2007 visit with Dr. Ross and found that Claimant waited a significant period of time before seeking treatment.  However, an x-ray report of Claimant's lumbar spine dated August 18, 2006, reports a history of pain and suggests Claimant has "some minor degenerative disc disease."  (Tr. 318.)  An x-ray of Claimant's bilateral hips dated the same day reports a history of pain and, "[t]ransitional vertebra at the lumbosacral junction, with partial sacralization and a pseudoarthrosis on the left, but otherwise negative bilateral hips."  (Tr. 312.)  These x-rays are consistent with Claimant's allegation that she was injured in June 2006 and sought treatment shortly thereafter.

The ALJ found that the objective medical evidence classifies Claimant's impairments as "mild, at best."  However, at Step Two the ALJ found that Claimant suffers from several severe impairments, including fibromyalgia, a rheumatic disease.  In *Benecke v. Barnhart*, the Ninth Circuit explained the subjective nature of diagnosing fibromyalgia:

> Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.

379 F.3d 587, 590 (9th Cir. 2004).  The Ninth Circuit described fibromyalgia symptoms as "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue."  *Id*.  Claimant reported the above symptoms and, based on her self-reporting, two rheumatologists diagnosed her with fibromyalgia.  Most of Claimant's subjective complaints are characteristic of the medically recognized symptoms of fibromyalgia.  When he discounted Claimant's credibility because the

objective medical evidence characterized her impairments as mild, the ALJ either ignored or misunderstood the subjective nature of diagnosing fibromyalgia.

The ALJ also found that Claimant was resistant to "any" and "several" recommended treatments.  He specifically found it relevant that a neurosurgeon at Stanford recommended that Claimant quit smoking.  The ALJ characterized this as one of several treatments that Claimant has not tried.  (Tr. 28-29.)  However, the June 6, 2009, report from Dr. Cheng at Stanford does not mention quitting smoking.  (Tr. 395-97.)  In October 2007, Dr. Ross recommended that Claimant quit smoking, and in November 2007, Dr. Groskopp noted that Claimant reported smoking less per day and was trying to decrease.  (Tr. 216, 279.)  These reports indicate that Claimant has tried to quit smoking.  Furthermore, besides her prescribed medication and injections, Claimant has tried physical therapy and a TENS unit.  (Tr. 342, 357.)  None of Claimant's health care providers have recommended surgery as a treatment option.  (Tr. 46.) The record indicates that the only recommended alternative treatment Claimant has not tried is a spinal cord stimulator.  However, she was not cleared for that procedure because she never followed up with Dr. Kauder.  The above facts indicate that the ALJ's credibility determination was partially based on misrepresentations of Claimant's disposition towards alternative treatment methods.

The ALJ also misrepresented parts of the record regarding Claimant's pain treatment that were relevant to his credibility determination.  The ALJ found that Claimant's continued and increased use of painkillers after reporting fifty-percent pain relief hurt her credibility.  However, in the decision, the ALJ acknowledged that Dr. Johnston increased Claimant's dosage of Fentanyl after advising her that her prescribed medications will lose effectiveness.  Furthermore, Claimant reported 50 percent pain relief earlier in her treatment, but it only lasted for a couple of

weeks.  Also, referring to Claimant's November 12, 2007, appointment with Dr. Groskopp, the ALJ claimed that Dr. Groskopp remarked that Claimant requested the examination in order to obtain a stronger pain medication than PA Ryland could prescribe.  (Tr. 28.)  However, Dr. Groskopp never indicated that Claimant requested that appointment for any reason, and also noted that Claimant did not particularly want to get on a stronger pain medication.  (Tr. 279.)  The ALJ's misrepresentations imply that Claimant exhibited drug-seeking behavior; however, this is not supported by evidence in the record.

The ALJ did not give clear and convincing reasons for rejecting Claimant's subjective symptom testimony.  He misrepresented medical evidence in the record and, based on these misrepresentations, found that Claimant's subjective pain testimony lacked credibility.  In doing so, the ALJ failed to make the necessary showing to lawfully reject Claimant's testimony and, thus, the ALJ erred.

II.   Medication Side Effects

Claimant argues that the record reflects that she suffers from severe medication side effects and that the ALJ erred by failing to consider those side effects when making the RFC assessment.  Specifically, Claimant argues the ALJ did not consider the following medication side effects documented in the record: fatigue, poor balance and falling, slurred speech, difficulty driving, forgetfulness, and difficulty concentrating.  The Commissioner responds that the ALJ properly excluded the alleged side effects because Claimant's subjective allegations were disproportionate to the objective medical evidence.

The ALJ must consider medication side effects in the disability determination process because, like pain and other symptoms, side effects can significantly impact an individual's ability to work.  *Varney v. Sec'y of Health and Human Servs.*, 846 F.2d 581, 585 (9th Cir. 1988).

Side effects can vary on an individual basis and "a claimant's testimony as to their limiting effects should not be trivialized." *Id*. Therefore, an ALJ must support the decision to disregard medication side effect testimony with specific findings similar to those required to disregard subjective symptom and pain testimony. *Id*. However, the ALJ does not have to prepare a function-by-function analysis for medical conditions or impairments that the ALJ finds neither credible nor supported by the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). Furthermore, the Ninth Circuit has held that "[a] claimant bears the burden of proving that an impairment is disabling." *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

The ALJ did not refer to Claimant's alleged side effects in the decision or question Claimant about them at the hearing. In the decision, the ALJ concluded that Claimant's subjective symptom testimony lacked credibility to the extent it was inconsistent with the RFC, without regard to whether Claimant's symptom testimony was related to her medication side effects. Accordingly, the court must determine whether Claimant's alleged side effects are supported by the record. If Claimant's alleged side effects are supported by the record, the ALJ was required to consider them and give clear and convincing reasons for disregarding Claimant's testimony regarding the symptoms caused by her medication.

The record evidences the following medication side effects. On December 6, 2007, Dr. Levin noted that Claimant stopped taking Lyrica because it was causing central nervous system (CNS) side effects. (Tr. 219.) On April 23, 2008, PA Ryland noted that Claimant wanted to stop taking Ambien because it made her wake up feeling drunk. (Tr. 268.) On December 12, 2007, PA Ryland noted that Claimant reported a frightening episode of temporary immobility and the inability to yell after taking Lyrica and Ativan. (Tr. 275.) On November 11, 2007, Dr. Groskopp noted that, after taking Lyrica, Claimant suffered an episode where she could not talk

or move for 15-30 seconds.  (Tr. 276.)  During that episode Claimant reported that her eyes were quivering, it felt like "sound was zooming from ear to ear" and like "someone had splashed paper in front of her."  *Id*.  Dr. Groskopp noted that Claimant had previously reported episodes where she saw "splashed paper" in front of her.  *Id*.  On November 18, 2009, Dr. Johnston noted that Claimant was tolerating her pain medication well, except for an episode where Claimant reported experiencing tremors, the inability to finish a sentence, dizziness, and lightheadedness.  (Tr. 467.)  On February 11, 2010, Claimant reported to Dr. Kauder that her memory had significantly declined and as a result she no longer had the cognitive ability to perform her past work.  (Tr. 472.)  Claimant reported uncharacteristically forgetting appointments and having trouble coming up with words when trying to communicate.  *Id*.  Claimant opined to Dr. Kauder that these neurocognitive changes could be due to her prescription medications.  *Id*.

The record shows that Claimant has periodically suffered from some medication side effects.  Besides the side effects listed above, Claimant reported episodes where she suffered neurological symptoms including speech disturbance, slurred speech, and loss of consciousness.  (Tr. 410.)  Claimant also reported instances where her right knee or the back of her legs would give out and cause her to fall.  (Tr. 392.)  The record does not indicate whether these additional symptoms are medication side effects.  However, to the extent that the record indicates Claimant periodically suffers and may continue to suffer some medication side effects, the ALJ erred when he failed to consider those side effects in the disability determination.

III.    <u>Development of the Record</u>

Claimant argues that the ALJ failed to fully develop the record, and the failure to do so was a reversible error.  Specifically, Claimant argues that she was treated for depression and anxiety and the ALJ should have developed the record to resolve any ambiguity regarding

Claimant's psychological impairments.  Furthermore, Claimant argues the ALJ should have contacted Claimant's treating and examining sources to inquire about Claimant's ability to function despite her impairments.  The Commissioner responds that the ALJ had no duty to develop the record because the record contains physical and mental assessments of Claimant's abilities despite her impairments.

The ALJ has a special duty to fully and fairly develop the record and ensure the claimant's interests are considered, regardless of whether the claimant is represented by counsel. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, it is the claimant's duty to provide evidence of his or her disability. 42 U.S.C. § 423(d)(5)(A) (2004). The ALJ's duty to develop the record is triggered when the evidence provided is ambiguous, or when the ALJ finds the record is inadequate for properly evaluating the evidence. *Tonapetyan*, 242 F.3d at 1150.

In *Tonapetyan*, the ALJ rejected the opinions of the claimant's treating physician and examining psychiatrist regarding the claimant's mental impairments because they were heavily reliant on the claimant's subjective statements.  *Id*.  The ALJ did not specifically find that the evidence of the claimant's mental impairment was ambiguous, but instead relied on the testimony of a medical expert who found that evidence ambiguous.  *Id*.  The medical expert found the lack of anecdotal evidence regarding the claimant's mental impairments to be confusing, and recommended obtaining a more detailed report.  *Id*.  The Ninth Circuit held that the ALJ's decision to ignore the medical expert's concerns over the incomplete record and recommendation that a more detailed report be obtained constituted reversible error.  *Id.* at 1151.

Like the doctors in *Tonapetyan*, several of Claimant's treating physicians have opined that Claimant demonstrates symptoms of anxiety and depression.  Furthermore, Dr. Kauder could not comment on Claimant's psychological symptoms because Claimant never followed up

with him for a more detailed evaluation.  Also like *Tonapetyan*, the physicians' opinions are based heavily on Claimant's subjective statements.  Finally, Claimant has been prescribed Effexor, a medication used to treat depression.  Because in *Tonapetyan* the Ninth Circuit found the ALJ's failure to develop the record under similar circumstances to be a reversible error, the court here finds that the ALJ erred when he chose not to develop the record regarding Claimant's reported anxiety and depression.

IV.    <u>Lay Witness Statements</u>

Claimant argues that the ALJ improperly rejected some of the statements of the lay witness, Ms. Chisolm.  Specifically, Claimant argues that the ALJ did not identify which parts of Ms. Chisolm's function report were based on Claimant's subjective reporting when he determined that portions of the function report were not credible.  The Commissioner responds that the ALJ dismissed portions of Ms. Chisolm's written testimony for germane reasons and, although he was not required to, the ALJ identified several portions of Ms. Chisolm's written testimony that were based on Claimant's subjective reporting.

Lay witnesses in a position to observe a claimant's daily symptoms and activities are competent to testify as to the claimant's symptoms.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  The Ninth Circuit recognizes that lay witnesses may have to rely to some extent on a claimant's subjective reporting.  *Dodrill*, 12 F.3d at 918.  However, lay witnesses can make their own independent observations of the claimant's symptoms.  *Id.* at 919.  An ALJ may not

disregard lay witness testimony based on finding the claimant lacks credibility and believing the lay witness merely repeated the claimant's complaints.  *Id.* at 918-19.

On the function report completed by Ms. Chisolm, questions 8 through 23 relate to Claimant's daily activities and abilities.  (Tr. 153-59.)  The majority of those questions have sub-questions that Ms. Chisolm also answered.  *Id.*  Ms. Chisolm referred to Claimant's subjective reporting in response to only three questions or sub-questions.[2]  Ms. Chisolm does not make any other mention of Claimant's subjective reporting and did not testify in front of the ALJ.  Ms. Chisolm reported that she sees Claimant three or four times per week for several hours each time, sometimes more often.  (Tr. 153.)  Based on the amount of time Ms. Chisolm spends with Claimant, the court finds that Ms. Chisolm is in a position to observe Claimant's daily symptoms and activities.  Accordingly, Ms. Chisolm was competent to testify as to Claimant's symptoms.  Therefore, the ALJ was required to take Ms. Chisolm's testimony into account unless he expressly determined to disregard it and gave reasons germane to Ms. Chisolm for doing so.

The ALJ did not expressly determine to disregard Ms. Chisolm's testimony, instead he gave it "some weight in that it reflects that the claimant does have limitations on prolonged activities."  (Tr. 27.)  The ALJ noted that the function report "generally supported the claimant's allegations."  *Id.*  However, the ALJ found the credibility of the report to be lessened because "Ms. Chisolm relied heavily on the claimant's subjective reporting rather than her own observations."  *Id.*  The ALJ provided no basis or cite from the record to support his finding that Chisolm relied heavily on Claimant's subjective reporting.  Furthermore, as the Ninth Circuit

---

[2] Response to question 13: "She talks a lot about being up at night, or sleeping off and on due to not being able to sleep."  (Tr. 154.)  Response to question 15(b): "She states that she is unable to tolerate her back pain when she stands for any period of time."  (Tr. 155.)  Response to question 20(c): "She has stated it is hard for her to do crosswords because of memory problems and she sadly does not really do anything anymore that she used to." (Tr. 157.)

explained in *Dodrill*, the ALJ's belief that the Ms. Chisolm is merely repeating the claimant's complaints, coupled with finding that Claimant lacks credibility, is not sufficient reasoning to disregard Ms. Chisolm's testimony.

For the above reasons, the ALJ erred when he disregarded Ms. Chisolm's written testimony without giving a reason germane to Ms. Chisolm.

V.    Vocational Hypothesis

Claimant argues the ALJ's vocational hypothesis was invalid. Specifically, Claimant argues the ALJ erred by omitting the limitations related to Claimant's medication side effects and severe mental impairments, as well as by omitting Claimant's and Chisolm's credible allegations. As a result, Claimant argues the VE's testimony that Claimant can perform the occupations identified by the ALJ has no evidentiary value. The Commissioner responds that the ALJ's hypothetical to the VE was valid because it included the medical assumptions supported by the substantial evidence in the record.

An ALJ may rely on a VE's responses to vocational hypotheticals when determining a claimant's disability. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). An ALJ's hypothetical to a VE must include the claimant's pain, inability to engage in certain activities, and all other restrictions and limitations. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). The assumptions in the hypothetical must be supported by the record; otherwise, the VE's opinion has no evidentiary value. *Id.*

Because the ALJ erred in disregarding Claimant's testimony, disregarding medication side effects, failing to develop the record, and disregarding Chisolm's testimony, the hypothetical given to the VE did not include all of Claimant's restrictions and limitations. Therefore, the hypothesis was invalid and the VE's opinion has no evidentiary value.

VI.    <u>Remand</u>

Claimant requests that the court remand this decision for an award of benefits.  "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  In *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for benefits is appropriate:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id.* at 593 (citations and emphasis omitted).  Evidence rejected by the ALJ should be credited and remand for benefits granted where: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

This case should be remanded for an award of benefits.  The ALJ disregarded much of the testimony of both Claimant and Chisolm without giving legally sufficient reasons.  The ALJ also failed to consider any evidence, testimonial or in the record, of Claimant's medication side effects.  Furthermore, the ALJ made findings that were unsupported by the record or any other proffered basis.  As a result, the court must credit the evidence rejected by the ALJ and, having done so, finds Claimant disabled and sees no benefit to be gained from enhancement of the record.

*Conclusion*

For the reasons stated, the decision of the Commissioner denying Claimant's application should be reversed and remanded for an award of benefits.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due November 13, 2013.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th day of October, 2013.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge